# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | | |
|---|---|---|
| **M.L. & J.L.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | NO. 3:16-cv-1093 |
| | ) | |
| **WILLIAMSON COUNTY BOARD** | ) | JUDGE CAMPBELL |
| **OF EDUCATION,** | ) | MAGISTRATE JUDGE |
| | ) | NEWBERN |
| **Defendant.** | ) | |

## MEMORANDUM

Pending before the Court is Defendant's Motion for Summary Judgment. (Doc. No. 39). Plaintiffs filed a response in opposition (Doc. No. 43), and Defendant has replied. (Doc. No. 45). For the reasons discussed below, Defendant's motion for summary judgment is **GRANTED**.

### I.   FACTUAL BACKGROUND

Plaintiffs, M.L and J.L, allege retaliation against Williamson County Board of Education ("WCBOE") under Section 504 of the Rehabilitation Act, the Americans with Disabilities Act ("ADA") and the First Amendment under § 1983. (Doc. No. 1). Plaintiffs asserts Defendant engaged in retaliatory conduct on two occasions by reporting to the Department of Children's Services ("DCS") that Plaintiffs abused or neglected their disabled son. (*Id.*).

Plaintiff, J, has a "disability" as defined under the ADA and Section 504. (*Id.* at 2). Specifically, J was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and Oppositional Defiance Disorder ("ODD"). (Doc. No. 43-1 at 1). During the 2015-2016 school year, J attended Kenrose Elementary and had teachers who worked closely with him, including: Carrie Glover, who served as J's second grade special education teacher, Allyson Whitley, who served as J's general education teacher, and Pam Callaway, who served as a special education

1

teacher's assistant for J. (*Id*. at 2). During the 2015-2016 school year, J had an Individualized Education Program ("IEP") in place at Kenrose. (*Id*. at 1). Throughout the school year M.L. had IEP meetings with teachers and faculty to discuss J and his IEP and make changes. (*Id.* at 24). At an IEP meeting on January 14, 2016, M.L. and J's teachers discussed J's eligibility for extended school year ("ESY") during the summer, but it was proposed that ESY would not be the best fit for J; instead the teachers agreed home visits over the summer would work better for J. (*Id.* at 24). M.L. renewed her request for ESY at a meeting on May 18, 2016, but again it was denied. (*Id.* at 25). J's Behavioral Intervention Plan ("BIP") was discussed at IEP meetings in both May and September of 2015, and was expected to be revised over the summer after the 2014-2015 school year, but was not put in place until November of the 2015-2016 school year. (*Id.* at 25-26). Over the 2015-2016 school year, M.L. and Ms. Glover had an amicable relationship, as evinced through emails M.L. sent to Ms. Glover. (*Id.* at 3-4). However, during the 2015-2016 school year, Kenrose staff made three reports to DCS concerning J. (*Id.* at 5).

The first DCS report was made on November 9, 2015, by Ms. Callaway. (*Id*. at 5). Ms. Callaway offered to write J's assignment and noticed J was teary and emotional. (*Id*.). J informed Ms. Callaway that over the weekend his father, J.L., hurt J and his brother by twisting their arms and pinching their noses. (*Id*.). J also stated that J.L. was mad at J and his brother because they were taking naked pictures of J.L. and made a "naked room" to hang the pictures. (*Id*. at 6). When asked about the "naked room" J stated that J.L. had his shirt off but was wearing pants and underwear. (*Id.*). Ms. Callaway asked if J.L. was playing when he pinched and twisted J and his brother's arms, and J reported that he was a little afraid. (*Id.*). On November 24, 2015, a DCS investigator interviewed J.L. concerning the November 9, 2015 report and J.L. admitted to twisting J's arm and pinching his nose, but stated he was only playing with J. (*Id.*). On December 8, 2015,

M.L. saw J's psychiatrist, and the progress note for the visit stated, "Mother has to be more protective, doesn't leave father alone with kids." (*Id.* at 7-8). On December 10, 2015, DCS closed the case. (*Id.* at 7).

On March 31, 2016, a second report to DCS was filed by Ms. Glover after J told Ms. Whitley that his father was in trouble for spanking J and pulling J's hair and nose. (*Id*. at 8). Ms. Whitley believed J was reporting a recent event, not events from November. (*Id.*). Along with the spanking incident, the DCS report also included an incident from September 29, 2015, where J grabbed a student around the waist and thrust his pelvic area into the other boy's bottom, and an incident from March 30, 2016, where the same student was bending over to tie his shoe and J wrapped his arms around the student's waist and hit the boy on the bottom. (*Id.* at 9). After the September 29th incident J met with the school counselor at Kenrose Elementary and the school counselor read and reviewed the book, "Good, Touch, Bad Touch" with J. (*Id.* at 11). DCS screened out the March 31, 2016 report the same day without investigation because a report mentioning "pinching of the nose" had already been investigated. (*Id.*).

The third report to DCS was made on May 13, 2016, involving an incident where J put his head against a student's bottom. (*Id.* at 12). The incident involved the same student from the September 29, 2015 and March 30, 2016 incident. (*Id.*). Ms. Glover was concerned because of the sexual nature of J's behavior, given that J was only seven years old at the time. (*Id*. at 13). Ms. Glover consulted with the behavioral specialist, Lindsay Naylor, prior to contacting DCS, who agreed that under the circumstances Ms. Glover should report the incident to DCS. (*Id.* at 14-15). The DCS report identified the allegation as one of sexual abuse involving an unknown perpetrator. (*Id.* at 15). On May 13, 2016, J underwent a forensic interview at the Davis House Child Advocacy Center. (*Id.* at 18). During the interview J reported that his brother would touch J's penis on top of

his clothes, or when J is changing his brother would touch his bottom, and that his brother sometimes would insert his finger in J's anus. (*Id.* at 18-19). J stated that when this occurred he felt weird and his clothes were off. (*Id.* at 19). J also reported that he sometimes touched his brothers' penises and bottoms on top of their clothing when he was acting funny. (*Id.*). On May 13, 2016, the DCS investigator visited Plaintiffs' home and completed a Non-Custodial Permanency Plan, which recommended that M.L. place a baby monitor in the hallway outside of J's room and bells on his door handle to allow Plaintiffs to hear if J got up in the night to go into his brother's room. (*Id.* at 20-21). M.L. expressed concerns with J's psychiatrist that J would touch his brothers inappropriately and would not allow J to be with his brothers unsupervised. (*Id.* at 16-17). The psychiatrist's record noted J exhibited symptoms of "grandiosity, hyper sexuality with inappropriate touching but the behavior seems to be more persistent, hasn't noticed cycling behavior." (*Id*. at 17).

After the third DCS was filed, M.L. expressed her concerns in a four-page email dated May 20, 2016 after an IEP meeting on May 18, 2016. (Doc. No. 41-4 at 5-7). M.L. discussed concerns regarding restraints and seclusion used on J and also reported that she and J.L. were concerned that Kenrose staff members were hyper-focused on J and his behavior. (*Id.*). She expressed how it took a long time to get an appropriate behavior plan in place for J and other concerns she had regarding the teachers behavior towards J. (*Id.*). M.L. also mentioned J changing schools for the 2016-2017 school year. (*Id.*). M.L. alleges she advocated for her son during the school years and believed the DCS reports were in retaliation for speaking out during the IEP meetings. (Doc. No. 43-2).

## II. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Rodgers v. Banks,* 344 F.3d 587, 595 (6th Cir. 2003). The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the nonmoving party's case. *Id.*

In evaluating a motion for summary judgment, the court views the facts in the light most favorable for the nonmoving party, and draws all reasonable inferences in favor of the nonmoving party. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 242 (6th Cir. 2015); *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Rather, the Court determines whether sufficient evidence has been presented to make the issue of material fact a proper jury question. *Id.* The mere scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; instead, there must be evidence of which the jury could reasonably find for the nonmoving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

### III. ANALYSIS

#### A. RETALIATION UNDER §504 OF THE REHABILITATION ACT AND THE ADA

Under the Individuals with Disabilities Education Act ("IDEA"), a local education agency is required to "create an [IEP] for…disabled students." 20 U.S.C. § 1400 *et seq.*, *see also F.H. ex rel. Hall v. Memphis City Schs.*, 764 F.3d 638, 641 (6th Cir. 2014). The statute "guarantees these children a Free Appropriate Public Education ("FAPE") ... in conformity with the IEP" and "provides specific procedural recourse should an involved party object to the construction or

implementation of the IEP." *Hicks v. Benton Cnty. Bd. of Educ.*, 222 F. Supp. 3d 613, 633 (W.D. Tenn. Dec. 1, 2016). Both the ADA and Section 504 prohibit retaliation against an individual seeking to enforce rights under the IDEA. *See, e.g.,* 42 U.S.C. § 12203 *and* 28 C.F.R. 35.134 (ADA); 29 U.S.C. § 794(a) *and* 29 C.F.R. § 33.13 (Section 504). "The ADA and Section 504 have a similar scope and aim; for purposes of retaliation analysis, cases construing either Act are generally applicable to both." *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 697 (6th Cir. 2013) (citing *Andrews v. Ohio,* 104 F.3d 803, 807 (6th Cir.1997)).

To show a violation of these statutes, a plaintiff may utilize direct or circumstantial evidence. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). If the plaintiff relies on indirect, circumstantial evidence, as here, the court is to analyze the claim based on the familiar burden-shifting analysis articulated in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973). Plaintiffs must first establish, by a preponderance of the evidence, that (1) they engaged in activity protected under Section 504 and the ADA; (2) WCBOE knew of this protected activity; (3) WCBOE then took adverse action against Plaintiffs; and (4) there was a causal connection between the protected activity and the adverse action. *A.C.*, 711 F.3d at 697 (citing *Gribcheck v. Runyon,* 245 F.3d 547, 550 (6th Cir.2001). "The bar for demonstrating the prima facie case is a low one." *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). If the plaintiff establishes a *prima facie* case, "the defendant has a burden of production to articulate a nondiscriminatory reason for its action." *Hicks*, 222 F. Supp. 3d at 635. "If the defendant meets its burden, the plaintiff must prove the given reason is pretext for retaliation." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015).

Here, Defendant argues Plaintiffs cannot establish a *prima facie* case for retaliation because Plaintiffs cannot show a causal connection between Plaintiffs advocacy for educational services

and the DCS reports filed. (Doc. No. 40 at 9). Defendant further argues that even if Plaintiffs establish a *prima facie* case for retaliation, the school personnel had a legitimate, non-retaliatory reason for reporting to DCS, thus Plaintiffs cannot demonstrate pretext. (*Id.*). Plaintiff responds that the timing, falsity of the DCS reports, and lack of context of the DCS reports shows that WCBOE was motived in part by retaliation. (Doc. No. 43 at 17). The Court will analyze the DCS reports under the *McDonnell* analysis in turn.

1. **November 9, 2015 DCS Report** [1]

As explained in detail in the Factual Background, J reported to Ms. Callaway that his father, J.L., physically hurt J and his brother and J was afraid. Defendant argues Ms. Callaway had a statutory duty to report this alleged physical abuse to DCS. (Doc. No. 40 at 12). Defendant argues Plaintiff cannot establish a *prima facie* case for retaliation because there was no causal connection between the IEP meetings throughout the year and the DCS report. (*Id.*). Plaintiff responds that in November 2015, M.L. had a series of IEP meetings on November 2, 5, and 10, 2015. (Doc. No. 43 at 6). Plaintiff alleges the November 5th meeting became tense because Plaintiffs had written a lengthy comment in the "Parent Concerns" section of the IEP. (*Id.*). After seeing the lengthy statement, members of the IEP team became upset and one member, Ms. Briley stated that the Plaintiffs did not appreciate them. (*Id.*; Doc. No. 43-2 at 43-44). Four days later Defendant filed a DCS report in retaliation for Plaintiffs voicing their concerns. (*Id*. at 6-7). Defendant responds that Ms. Callaway was not involved in any of the IEP meetings or in the decision making process about the services provided to J. (Doc. No. 45 at 4; Doc. No. 43-1 at 21).

---

[1] In Defendant's Motion for Summary Judgment, Defendant notes that while the Complaint identifies the November 9, 2015 report to DCS as an instance of retaliation, in the discovery responses Plaintiff only identifies the DCS reports made in March and May of 2016 as alleged retaliatory actions. Because Plaintiff's response addresses the November 9, 2015 DCS report as well, the Court will conduct a separate analysis relating to that report.

The Court finds Plaintiffs do not establish a *prima facie* case for retaliation for the November 9, 2015 report because Plaintiffs have not shown a causal connection. Plaintiffs do not dispute that Ms. Callaway filed the DCS report and was not involved in any IEP meetings. (Doc. No. 43-1 at 21; Doc. No. 41-6 at 55). In order to state claim for retaliation a defendant must *know* of the protected activity and take adverse action against the plaintiff. (emphasis added) *See Wenk v. O'Reilly*, 783 F.3d 585 (6th Cir. 2015) (finding causal connection when the teacher called Franklin County Children Services three weeks after the Ohio Department of Education contacted the teacher about plaintiffs concerns with their disabled daughter's education plan); *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687 (6th Cir. 2013) (finding causal connection when plaintiffs made a request to the principal for classroom glucose testing for their daughter and days later the principal filed a DCS Report); *Hicks v. Benton Cnty. Bd. Educ.*, 222 F. Supp. 3d 613 (W.D. Tenn. Dec. 1, 2016) (finding a causal connection when plaintiff filed a complaint against the school and principal terminated plaintiff's employment). Here, Plaintiffs offers no evidence that Ms. Callaway knew of M.L.'s lengthy statement and complaints to the IEP team when she filed the DCS report, therefore Plaintiffs cannot establish a *prima facie* case for retaliation.

**2. March 31, 2016 and May 13, 2016 DCS Reports**

As discussed above, on March 31, 2016, Ms. Glover and Ms. Whitley filed a DCS report after J stated that his father was in trouble for spanking him and pulling his hair and nose. (Doc. 43-1 at 8). Ms. Whitley believed J was reporting a recent event, instead of restating the event that occurred in November 2015. (*Id.*). The DCS report also included an incident from September 29, 2015, where J grabbed a student around the waist and thrust his pelvic area into the other boy's bottom, and an incident from March 30, 2016, where the same student was bending over to tie his shoe and J wrapped his arms around the student's waist and hit the boy on the bottom. (Doc. No.

41-6 at 49). The DCS report also included information about J and his younger siblings sleeping arrangement. (*Id.*). DCS screened out the reported incident the same day the report was filed because the report contained similar allegations as the November 9 DCS report. (*Id.* at 50; Doc. No. 43-1 at 11).

On May 13, 2016, Ms. Glover filed another DCS report that was labeled as "sexual abuse" due to J crawling on top of another student and moving his face up and down on the student's bottom. (Doc. No. 41-6 at 2). The report also stated that M.L. was uncomfortable leaving J and his brother alone together and discussed how all the children sleep in a bed with M.L. (*Id.*). Ms. Glover spoke with the school's behavioral specialist, Lindsay Naylor, before contacting DCS. (Doc. No. 43-1 at 14). DCS conducted an interview with J and investigated Plaintiffs' home, before recommending that M.L. to place a baby monitor and a bell in the hallway outside J's room so Plaintiffs would know if J got up in the middle of the night. (*Id.* at 18-20; Doc. No. 41-6 at 19).

### a. *Plaintiffs have established the second element of the prima facie case, adverse action*

Defendant argues the Court should grant summary judgment because the March 31, 2016 report does not constitute an "adverse action." (Doc. No. 40 at 13). Defendant argues that because DCS screened out the report the day they received it and did not conduct an investigation, Plaintiffs were not dissuaded from engaging in protected activity. (*Id.* at 13-14). However, the Court disagrees with Defendant's argument. For a retaliatory action to be adverse, the action "must be enough to dissuade a reasonable person from engaging in the protected activity; 'petty slights or minor annoyances cannot qualify.'" *A.C. ex rel. J.C. v. Shelby Cnty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013) (citing *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). The Sixth Circuit has treated a filed DCS report as adverse actions that would "chill a person of ordinary firmness" from engaging in protected activity. *Jenkins v. Rock Hill Local Sch.*

*Dist.*, 513 F.3d 580, 588-89 (6th Cir. 2008); *see also Wenk v. O'Reilly,* 783 F.3d 585, 595 (6th Cir. 2015). Therefore, the Court concludes that Plaintiffs adequately established the adverse-action element of their *prima facie* case.

### b. *Plaintiffs establish the third element of the prima facie case, causal connection*

The last element of the *prima facie* case turns on whether there is a causal connection between Plaintiffs' protected activities and the allegedly retaliatory DCS Reports. Again, at the *prima facie* stage, Plaintiffs' burden is minimal, requiring merely that they "put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity." *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000).

Defendant argues there is no temporal proximity between the matters described in Plaintiff M.L.'s May 20, 2016 email and the March DCS report. (Doc. No. 40 at 15). Defendant asserts M.L.'s email references her request that J attend a different school for the 2016-2017 school year and apologizes for becoming emotional during the May 18, 2016 IEP meeting. (*Id.*; Doc. No. 41-4 at 5-7). Defendant argues that both the IEP meeting and the email occurred nearly two months after the March 31 DCS report, and therefore the report could not have been made in retaliation for M.L.'s request to change schools or her demeanor at the May 18, 2016 meeting. Defendant argues that M.L.'s May 20, 2016 email also referenced her request that J receive ESY during the summer of 2016. (*Id.* at 15; Doc. No. 41-4 at 5-6; Doc. No. 43-1 at 24). However, J's eligibility for ESY was addressed during an IEP meeting in January 2016, two months prior to the DCS report. (Doc. No. 43-1 at 24). M.L. renewed her request for ESY at the IEP meeting held on May 18, 2016, two months after the DCS report was filed. (*Id.* at 25). Defendant argues that Plaintiffs allege no facts evidencing a nexus between the matters addressed in the May 20, 2016 email and

the March 2016 report to DCS, because the protected activities were either raised after the March 2016 DCS report or were resolved prior to the DCS report. (Doc. No. 40 at 17).

Plaintiffs argue the May 20, 2016 email actually shows they had been advocating for J throughout the school year and addresses M.L.'s efforts to get an appropriate BIP in place for J and reduce the number of isolations and restraints J was forced to endure. (Doc. No. 43 at 18). Plaintiffs assert they had a pattern of advocating on behalf of J, and while each DCS report may not have been in temporal proximity to the May 20, 2016 email, the DCS reports did closely follow advocacy by Plaintiffs. (*Id.*; Doc. No. 43-2 at 2-3). DCS reports always came within a few days of an IEP meeting between September 2015 and May 2016.[2] Plaintiffs argue the timing between the meetings and the DCS reports establishes a causal connection between the protected activity and adverse action.

Plaintiffs also argue evidence of falsity in the DCS reports, which when coupled with temporal proximity to the reports and Plaintiffs requests for accommodations for J, is sufficient to permit an inference of causation. (Doc. No. 43 at 17); *see also A.C.*, 711 F.3d at 701. Plaintiffs argue that for each DCS report filed, J's psychiatrist and DCS reached the conclusion that J's behaviors were innocent and caused by his disability, not by abuse. (*Id.*). Plaintiffs asserts Defendant documented that J's behaviors were caused by impulsivity, issues with boundaries, and immaturity, and yet, Defendant chose to report these incidents to DCS. (Doc. No. 43-2 at 55-77). Plaintiffs assert there is no requirement that the same behaviors that were unsubstantiated by DCS in the past, should continue to be reported over and over when the school knew and acknowledged J's behavior was due to his disability. (Doc. No. 43 at 20).

---

[2] IEP meetings on November 2, 5, and 10 about BIP and a DCS report was filed on November 9. 2015. IEP meeting on March 3 and a DCS report was filed on March 30, 2016. IEP meeting on April 26 and a DCS report filed on May 16, 2016. (Doc. No. 43 at 18-19).

Defendant responds that Ms. Glover did not exaggerate the contents of her reports to DCS, and personally observed J's behavior was sexual in nature which was unusual for a seven-year-old child. (Doc. No. 40 at 24; Doc. No. 43-1 at 32). Also, during J's interview with the Davis House Child Advocacy Center forensic examiner, he disclosed events that were characterized as sexual abuse involving digital penetration. (Doc. No. 43-1 at 18-20). Under these circumstances, Defendant asserts Plaintiff cannot demonstrate falsity with respect to Ms. Glover's May 2016 DCS report. (Doc. No. 40 at 25).

The Sixth Circuit has held that temporary proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence. *Parnell v. West*, 1997 WL 271751, * (6th Cir. 1997); *see also Nguyen v. City of Cleveland*, 229 F.3d 559, 565-67 (6th Cir. 2000); *Cooper v. City of North Olmsted*, 795 F.2d 1265 (6th Cir. 1986). Here, the Court finds Plaintiffs presented facts that support an inference that Ms. Glover and Ms. Whitley were motived, at least in part, by a retaliatory motive to make the child abuse reports. This Court looks to *Wenk v. O'Reilly*, 783 F.3d 585 (6th Cir. 2015), which has similar facts to the present case.[3] In *Wenk*, the Director of Pupil Services contacted Franklin County Children Services ("FCCS") three weeks after the Department of Education contacted her concerning the plaintiffs educational plan. *Id*. at 596. In taking the facts in a light most favorable to the plaintiff, the Sixth Circuit found that the Director embellished or entirely fabricated allegation in the report to clearly suggest sexual abuse.

---

[3] The Court recognizes that *Wenk v. O'Reilly*, 783 F.3d 585 (6th Cir. 2015) is a First Amendment retaliation case. However, First Amendment retaliation claims are also analyzed under a burden-shifting framework, and requires the same elements as an ADA retaliation claim. *Wenk*, 783 F.3d at 593. (finding "[a] plaintiff must first make a prima facie case of retaliation, which has three elements: '(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.'") ((citing *Dye v. Office of the Racing Comm'n,* 702 F.3d 286, 294 (6th Cir.2012))).

*Id.* The Director's report also included irrelevant personal allegations against plaintiff. *Id.* The Sixth Circuit also found that the Director learned of the allegations three weeks before calling FCCS. *Id.*

In the present case, Ms. Glover made DCS reports within weeks, sometimes days, after an IEP meeting took place. (Doc. No. 41-5). Although Ms. Glover's report contained some true allegations, the facts taken in a light most favorable to Plaintiffs suggest J was merely hugging his friend, not thrusting up against him, and placing his head on his friend's bottom like it was a pillow when watching a movie during class. (Doc. No. 41-6 at 14; Doc. No. 43-2 at 5). Both DCS reports filed by Ms. Glover also included irrelevant personal allegations against M.L., who allows her children to sleep in bed with her, and the May 13, 2016 report made references to an uncle that has substance abuse problems. (Doc. No. 41-6 at 9 and 49). Finally, Ms. Glover first saw J's alleged sexual behavior on September 29, 2015, but did not report this incident until the March 2016 DCS report, more than six months after the behavior occurred. (Doc. No. 43-1 at 9). Therefore, taking the facts in the light most favorable to Plaintiffs, the Court finds ample evidence of a causal connection and Plaintiffs establish all four elements of their *prima facie* case for ADA retaliation.

Defendant provides a non-discriminatory bases for reporting to DCS, pursuant to the statutory obligations under Tenn. Code Ann. § 37-1-403, which imposes a duty on school officials to report harm reasonably suggestive of child abuse. Due to J's inappropriate behavior of a sexual nature to the same male student, Mr. Glover and Ms. Whitley had a duty to report what they reasonably believed to be abuse. (Doc. No. 40 at 19, 25). The Court finds Defendant has carried its burden of articulating a non-retaliatory basis for the DCS Reports. *See A.C. ex rel. J.C. v. Shelby Cnty. Bd. Educ.*, 177 F.3d. 687, 701 (6th Cir. 2013). The burden therefore, shifts back to Plaintiffs to prove pretext.

### c. *Plaintiffs cannot show pretext*[4]

Plaintiff may prove pretext by demonstrating, by a preponderance of the evidence, that Defendant's non-retaliatory reason for calling DCS (1) lacked a basis in fact, (2) did not actually motivate the DCS reports, or (3) was insufficient to motivate the filing of DCS reports. *See Vincent v. Brewer Co.*, 514 F.3d 489, 497 (6th Cir. 2007). The Sixth Circuit explained,

> The first type of showing is easily recognizable and consists of evidence that the proffered bases . . . never happened, *i.e.,* that they are factually false. The third showing is also easily recognizable and, ordinarily, consists of evidence that other [students], particularly [students] not in the protected class, were not [subjected to DCS reports] even though they engaged in substantially identical conduct to that which the [defendant] contend motivated [their calling of DCS]. . . The second showing. . . the plaintiff admits the factual basis underlying the [teacher's] proffered explanation and further admits that such conduct could motivate dismissal. . . In such cases, the plaintiff attempts to indict the credibility of the [defendant's] explanation by showing circumstances which tend to prove that an illegal motivation was more likely than that offered by the defendant. In other words, the plaintiff argues that the sheer weight of the circumstantial evidence of discrimination makes it "more likely than not" that the [defendant's] explanation is a pretext, or a coverup.

*Hedrick v. Western Reserve Care System*, 355 F.3d 444, 461 (6th Cir. 2004). Here, Plaintiffs argue they can show pretext for all three situations.

Plaintiffs first argue the reports had no basis in fact because each allegation was unfounded by DCS. (Doc. No. 43 at 24). Therefore, Ms. Glover's continued belief that J's behavior manifested child abuse after DCS determined that was not the case, shows Ms. Glover did not file the report in good faith. (*Id.*). Plaintiffs further argue Defendant's statutory duties did not actually motivate the filing of the DCS reports, because if Ms. Glover was legitimately worried about child abuse

---

[4] Plaintiff cites to *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 814 (6th Cir. 2011) and argues the *McDonnell Douglas* analysis requires a plaintiff to prove causation twice and encourages the Court not to place too much emphasis on over-compartmentalizing under the *McDonnell* standard. (Doc. No. 43 at 23-24). However, the Court notes the Sixth Circuit in *Provenzano*, still applied the *McDonnell* burden-shifting analysis, but cautioned district courts not "to push all of the evidence into the prima facie stage" and to not merge the analysis of the nondiscriminatory justification and pretext stages into the prima facie case. *Provenzano*, 663 F.3d at 813.

she would have reported the September 29 incident immediately. (*Id.*). Finally, Plaintiffs argues Defendant's reasons were insufficient to motivate filing DCS reports because DCS and J's psychologist found the events transpired completely differently than they were reported. (*Id.* at 24-25). Ms. Glover reported J was moving his face up and down on the child's bottom, but DCS found him to be using his friend's bottom as a pillow. (*Id.* at 25). Ms. Glover reported J was thrusting his pelvis against a boy's bottom and spanking the boy's bottom, but DCS found J was hugging his friend. (*Id.*). Plaintiffs argue these behaviors were insufficient to motivate a logical person's statutory duty to report child abuse. (*Id.*).

In response, Defendant relies on the "honest belief" rule to dispute Plaintiffs' pretextual arguments. (Doc. No. 40 at 20). The Sixth Circuit applies the honest belief rule to the pretext stage and asks whether a defendant "made a reasonably informed and considered decision before taking an adverse . . . action." *Smith v. Chrysler*, 155 F.3d 799,807 (6th Cir. 1998). "If a defendant makes an error 'too obvious to be unintentional,' a fact-finder may infer that 'it had an unlawful motive for doing so.'" *A.C. ex rel. J.C. v. Shelby Cnty. Bd. Educ.*, 177 F.3d. 687, 705 (6th Cir. 2013) (citing *Id.*). Defendant argues Ms. Glover and Ms. Whitley, as mandatory reporters under Tennessee law, made a reasonable and informed decision for each DCS report. (Doc. No. 40 at 20). Both teachers reasonably relied on statements from J (Doc. No. 43-1 at 8) in the March 31 DCS report, and Ms. Glover observed J engaging in what she believed was inappropriate behavior of a sexual nature in the May 13 DCS report. (Doc. No. 40 at 20, 26; Doc No. 43-1 at 9-14). Even before reporting to DCS on May 13, Ms. Glover consulted with a behavioral specialist who also agreed J's behavior raised concerns of sexual abuse triggering a duty to report to DCS. (Doc. No. 40 at 26; Doc. No. 43-1 at 14-15). Finally, Defendant argues Tennessee law presumes the March 2016 and May 2016 DCS reports were made in good faith. *See* Tenn. Code Ann. § 37-1-

410(a)(5)(B), Tenn. Code Ann. § 37-1-613. For the reasons explained, Defendant asserts Plaintiff's cannot satisfy their burden because the presumption of good faith should apply to rebut any evidence of pretext. (Doc. No. 40 at 27).

The Court finds Plaintiffs do not show Defendant's proffered reasons for calling DCS were pretextual, because Ms. Glover and Ms. Whitley made reasonably informed decisions before making the reports. Under the honest belief rule, Ms. Glover and Ms. Whitley were to reasonably rely on the particularized facts that were before them at the time the decision to call DCS was made. *See Sullivan v. River Valley School Dist.*, 197 F.3d 804, 813 (6th Cir. 1999). In the March 31 DCS report J reported to Ms. Whitley that his father, J.L. was spanking him and Ms. Whitley reasonably believed J was reporting a recent event of physical abuse. (Doc. 43-1 at 8). The March 31 DCS report also included the September 29 incident where J grabbed as student and thrust his pelvic area into the boy's bottom. (Doc. No. 41-6 at 49). Ms. Glover reasonably believed that both incidents coupled together showed signs of abuse, and under Tennessee law she had a duty to report his information. (Doc. No. 41-1 at 3). The same may be said for the May 13 report, where Ms. Glover again noticed J behaving inappropriately towards the same student, which was unusual for a child J's age. (Doc. 43-1 at 12-13). However, this time Ms. Glover spoke with the behavioral specialist before filing a DCS report, who also agreed this behavior showed signs of sexual abuse. (*Id.* at 14).

While Plaintiffs argue DCS eventually closed all the cases and determined there was no abuse, the core allegations in the DCS reports contained reasonable and plausible information to allege abuse.[5] Even though Ms. Glover and Ms. Whitley may have been shown later to be

---

[5] It is also important to note that the May 13 DCS report led to J disclosing sexual conduct between him and his brother involving digital penetration, but it was determined J's behavior appeared developmentally appropriate for his age level. (Doc. No. 41-6 at 109; Doc. No. 43-1 at 18-20).

mistaken, the record establishes they honestly believed and relied on J's statements, J's actions, and the recommendations of the behavioral specialist before filing the DCS reports. The Court finds the undisputed facts show Defendant lacked the necessary retaliatory intent. *See Marshall v. The Rawlings Co. LLC*, 854 F.3d 368, 380 (6th Cir. 2017); *see also A.C. ex rel. J.C. v. Shelby Cnty. Bd. Educ.*, 177 F.3d. 687, 705 (6th Cir. 2013) (finding pretext after applying the "honest belief" rule because the comprised errors in the DCS report were too obvious to be intentional and the principal could have informed herself before filing a report by speaking with the school nurse). Therefore, summary judgment for Plaintiffs ADA and Section 504 retaliation claim is appropriate and Defendant's motion is **GRANTED**.

### B. FIRST AMENDEMENT RETALIATION UNDER § 1983

First Amendment retaliation claims are analyzed under a burden-shifting framework. "A plaintiff must first make a prima facie case of retaliation," which has three elements: "(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct." *Wenk v. O'Reilly,* 783 F.3d 585, 593-94 (6th Cir. 2015) (citing *Dye v. Office of the Racing Comm'n,* 702 F.3d 286, 294 (6th Cir.2012); *see also Thaddeus–X v. Blatter,* 175 F.3d 378, 394 (6th Cir.1999). If the plaintiff establishes a *prima facie* case, "the defendants can avoid liability by showing that [they] would have taken the same action even in the absence of the protected conduct." *Gaspers v. Ohio Dept. of Youth Services,* 648 F.3d 400, 412 (6th Cir. 2011). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Dye,* 702 F.3d at 294–95. "Unlike in the *McDonnell*

*Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Id.* at 295.

As analyzed above, Plaintiffs presents evidence to satisfy the *prima facie* elements for First Amendment retaliation. Therefore, the burden shifts to Defendant to show Ms. Glover and Ms. Whitley would have filed the DCS reports even in the absence of Plaintiffs complaints and advocacy regarding J and his IEPs. Defendant distinguishes the facts of this case from *Wenk*, insomuch that the record is void of any facts suggesting Ms. Glover and Ms. Whitley fabricated allegations they reported, but instead had reasonable cause to suspect child abuse, reported the allegations promptly, and harbored no animosity toward M.L. (Doc. No. 40 at 28-29; Doc. No. 43-1 at 3-4). The facts of this case are unlike *Wenk*, where the school official who reported the abuse suggested in an email that she harbored animus towards the father, embellished or fabricated the allegations in the DCS report, and waited until the Department of Education called her regarding plaintiffs' child's IEP plans before reporting the incidents that she knew about three weeks earlier. *Wenk*, 783 F.3d at 597-98.

Under a First Amendment retaliation claim, the Defendant must show that the teachers actually believed the duty to report was triggered and made reports because of that duty. *Holzemer v. City of Memphis,* 621 F.3d 512, 527 (6th Cir. 2010). As discussed above, Ms. Whitley believed the duty to report abuse arose when J told her his father spanked him, and Ms. Glover believed the duty to report arose when there were multiple instances of J displaying inappropriate sexual behavior, even after speaking with a behavioral specialist. In sum, the Court views the facts in the light most favorable to Plaintiffs, but concludes Plaintiffs do not establish a violation of their First Amendment rights. Accordingly, Defendant's motion for summary judgment for First Amendment retaliation is **GRANTED**.

## IV. CONCLUSION

Because there is no genuine issue of material fact as to Plaintiffs' retaliation claims under Section 504, ADA, or the First Amendment, summary judgment in Defendant's favor is appropriate. Therefore the Court **GRANTS** Defendant's Motion for Summary Judgment.

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE